JS-6

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ruben Castillo | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 4597 | **DATE** | 5/1/2002 |
| **CASE TITLE** | USA ex rel. Imari Clemons vs. Jonathan R. Walls, Warden | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Petitioner's writ of habeas corpus is granted. The State of Illinois is ordered to release Petitioner from prison unless the State retries and resentences him, as appropriate. Judgment is hereby entered in favor of the petitioner, Imari Clemons and against respondent, Jonathan Walls.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | |
| | No notices required. | | | |
| | Notices mailed by judge's staff. | | **MAY 0 2 2002** | |
| | Notified counsel by telephone. | | date docketed | 30 |
| ✓ | Docketing to mail notices. | | mu | |
| ✓ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| | | courtroom deputy's initials | date mailed notice | |
| RO | | | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

**DOCKETED**

MAY 0 2 2002

| | |
|---|---|
| United States of America<br>*ex rel.* IMARI CLEMONS,<br><br>Petitioner,<br><br>v.<br><br>JONATHAN R. WALLS, Warden,<br>Menard Correctional Center,<br><br>Respondent. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

No. 01 C 4597

Judge Ruben Castillo

## MEMORANDUM OPINION AND ORDER

Imari Clemons petitions this Court for a writ of habeas corpus, pursuant to 28 U.S.C.

§ 2254, attacking his state court first degree murder conviction and the resulting sentence.

Petitioner Clemons claims that: (1) he was denied the right to a fair trial by the admission of

extraneous evidence about gangs; (2) he was denied his Sixth and Fourteenth Amendment rights

to the effective assistance of counsel at both the trial and sentencing stages; and (3) the post-

conviction court erred when it did not grant an evidentiary hearing on his claim of ineffective

assistance of counsel for failing to call witnesses.[1]  On December 11, 2001, the Court granted

Clemons' motion for appointment of counsel, (R. 18), and ordered counsel to file a full brief in

support of Clemons' petition.  After a thorough review of Clemons' petition and his subsequent

brief, as well as a careful reading of the state trial court transcript and the entire state court

record, we grant Clemons' petition for a writ of habeas corpus.  (R. 1.)

---

[1] Petitioner's response – filed by his Court-appointed attorneys on March 11, 2002 –
subsumes Petitioner's third claim regarding an evidentiary hearing within his second claim of
ineffective assistance of counsel. (*See* R. 25-1, Pet'r's Resp. at 21-23.)  Consequently, the Court
will address Petitioner's third claim as part of our analysis of his ineffective assistance of counsel
claim.

## RELEVANT FACTS

When considering a habeas corpus petition, pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), we presume that the factual determinations of the state court are correct. 28 U.S.C. § 2254(e)(1). Petitioner Clemons has the burden of rebutting that presumption by clear and convincing evidence. *Id. See also Cossel v. Miller*, 229 F.3d 649, 651 (7th Cir. 2000). Accordingly, the following summary of the relevant facts is derived from the state trial court transcript and is supplemented, where appropriate, by the appellate record in *People v. Davenport*, 702 N.E.2d 335 (Ill. App. Ct. 1998).[2]

On May 8, 1997, following simultaneous trials before separate juries in the Circuit Court of Cook County, Lawon Davenport and Imari Clemons were found guilty of first-degree murder. On June 5, 1997, the trial court sentenced Petitioner Clemons to fifty-nine years in prison.[3] The record indicates that the following facts were adduced at both trials.

On the afternoon of October 6, 1994, Columbus and Antwan Hart were walking to their home on West 50th Street, when Antwan noticed a man at the corner of 50th and Peoria Streets. The man was dressed in black and wore a black cap cocked to the right with the words "I'm Real" on it, which indicated that – in that neighborhood – an individual was a member of the Gangster Disciples street gang.[4] The man approached Columbus and Antwan from behind and

---

[2] Lawon Davenport was the named codefendant, along with Imari Clemons, in the Illinois state court proceedings.

[3] The trial court sentenced Davenport to twenty-eight years in prison.

[4] The Gangster Disciples were a rival street gang of the Black P-Stone Nation. These gangs were at war at the time of the shooting. The northern boundary between the territories of the two gangs was at 51st Street.

said "GD," an apparent reference to the Gangster Disciples. When the man drew to within two feet of Columbus, he pulled a gun from his waistband, said "I ain't a GD. Never could be a GD," and shot Columbus, who fell backwards and died.

Although Antwan testified that he was looking at the gunman's face throughout the incident and that, after the shooting, he and the gunman looked at each other for a few more seconds before the gunman ran away, Ronald Robinson, another witness to the shooting, testified that Antwan had bent over to tie his shoes immediately prior to the shooting.[5] Jerome Weathers and Lamont Wesley, who are cousins and who were members of the Gangster Disciples at the time,[6] testified that they saw the gunman walk toward Columbus and Antwan, although neither saw the shooting itself. Both Weathers and Wesley have extensive criminal histories, and both were in custody at the time of their 1997 trial testimony. Although they denied that they had been offered deals in exchange for their testimony, Wesley admitted that he "wouldn't mind" if the State's Attorney did something on his behalf as a result of his testimony. (*See* R. 26-3, State Ct. Tr. at F-83-84.)

Chicago Police Officer John Kotarac, who was on the scene immediately following the incident, secured the area and interviewed several people, including Antwan and Weathers. Based on the information from these interviews, Officer Kotarac put out a description of the gunman: a black male, approximately fifteen to seventeen years old, six feet tall, 170 pounds,

---

[5] Robinson, who was eleven years old in 1994, testified that he witnessed the shooting from a distance of approximately one hundred feet. He did not see the gunman's face. Robinson's mother would not allow him to view a lineup. In 1995, when an investigator came to Robinson's home and showed him a photograph of five people sitting in a room, Robinson identified someone other than Clemons as the gunman.

[6] Wesley testified that Antwan was also a Gangster Disciple.

with a dark complexion and no apparent facial marks or scars. Detective James Ward was assigned to investigate and interview people following the shooting. Based on the information that he received, Ward began to look for two suspects: (1) Tyrone Matthews or "Doughboy," who was ultimately discovered to be Petitioner Clemons' codefendant, Lawon Davenport; and (2) "Eric," the alleged gunman. Ward created two descriptions of Eric: (1) on October 8, 1994 – two days after the shooting – Ward described Eric as a black male, approximately nineteen to twenty years old, 5'7" to 5'9" tall, with a medium build, light complexion and a teardrop tattoo under his right eye; (2) on October 12, 1994, Ward described Eric as a black male, approximately seventeen to twenty years old, 5'9" tall, with a thin build, dark complexion and a teardrop tattoo under his left eye.[7]

No suspects were apprehended in the weeks and months following the shooting. On November 13, 1995, over a year after the shooting, Detective Ward interviewed Davenport, who was in custody on an unrelated charge. Based on Davenport's statements to Ward, Petitioner Clemons was arrested.[8] On December 20, 1995, Antwan and Weathers viewed lineups and identified Petitioner as the gunman. Both were aware that the police suspected a man with a teardrop tattoo on his face, and Petitioner was the only man in the lineup with a teardrop tattoo. In April 1997, thirty months after the shooting and one month before Petitioner's trial, the

---

[7] In October 1994, Petitioner Clemons was eighteen years old. He is 5'6" tall, 150 pounds, with a medium complexion and a teardrop tattoo under his left eye.

[8] Davenport was interviewed twice by Chicago police detectives, and he also provided a written statement to the police. Davenport stated that he walked with the gunman – whom he identified as "Myron" with no last name or address – to the scene of the incident but that he did not witness the shooting. Davenport also stated that he and Myron were members of the Black P-Stones and that Myron was going to shoot a "GD" and needed Davenport to watch his back.

4

Assistant State's Attorney notified the police that Wesley may have witnessed the shooting. On April 15, when Wesley was taken from the "bullpen" – where prisoners were held – to view a lineup that included Petitioner, Wesley told Detective Joseph Stehlik that the man he had seen on the day of the shooting was also in the bullpen, and he identified Petitioner as that man. Wesley testified, however, that by the time of the lineup, he had already spoken with Petitioner in Cook County Jail, and that Petitioner had told him that he was in custody in connection with the shooting.[9]

At the end of its case against Davenport and Petitioner Clemons, the prosecution called Officer John Bloore as an expert witness to testify about Chicago street gangs.[10] Both defendants objected, but the trial court permitted Bloore to testify, even while acknowledging that "the issue of gang membership is very inflammatory." (R. 26-2, State Ct. Tr. at E-53-55.) Bloore, a purported gang specialist, testified regarding gang history, organization and tactics. Specifically, Bloore described "false flagging" as a tactic where a gang member enters rival territory posing as a member of the rival gang to draw a rival gang member into the open for an ambush (*e.g.*, cocking a hat in the manner of a rival gang). Furthermore, Bloore testified regarding tattoos

---

[9] Ronald Pluta, an investigator assigned to the Assistant State's Attorney, interviewed Wesley on April 4, 1997. Wesley talked about the shooting, but did not mention that the shooter had a teardrop tattoo on his left cheek.

[10] A recent article in the *ABA Journal* discusses the disturbing tendency of trial judges to permit "some beat cop or narcotics detective" to testify as an expert "about one thing or another, from the intent of a defendant caught with drugs to the organizational structure and hierarchy of street gangs . . . without presenting reliable research or data to support their opinions." Mark Hansen, *Dr. Cop on the Stand: Judges Accept Police Officers as Experts Too Quickly, Critics Say*, A.B.A. J., May 2002, at 32. Although the trial court noted that "Officer Bloore is a 25 year veteran of the police department with twelve years of gang investigation under his belt," (R. 26-4, State Ct. Tr. at G-81), this Court is still troubled by the lack of "reliable facts or data," *Dr. Cop on the Stand* at 34, supporting Bloore's testimony.

worn by members of the Black P-Stones. During this testimony and over objection, Petitioner was required to remove his shirt and stand in the well of the courtroom in front of the jury while Bloore identified Petitioner's tattoos as related to the Black P-Stones.[11] Neither Bloore nor any other witness, however, testified that Petitioner had the tattoos at the time of the shooting – almost three years earlier – or could otherwise link Petitioner to a gang at the time of the shooting.

After the jury trial, Petitioner was found guilty of first degree murder, and the trial court sentenced him to fifty-nine years in prison. The Illinois Appellate Court affirmed Petitioner's conviction on direct appeal. *See Davenport*, 702 N.E.2d 335. Petitioner did not file a petition for leave to appeal to the Illinois Supreme Court. On March 18, 1999, Petitioner filed a *pro se* petition for post-conviction relief, which was dismissed by the Circuit Court of Cook County on April 19, 1999. Petitioner appealed to the Illinois Appellate Court. His appointed counsel filed a motion to withdraw pursuant to *Pennsylvania v. Finley*, 481 U.S. 551 (1987), and Petitioner opposed the motion. On June 30, 1999, the Illinois Appellate Court granted counsel's *Finley* motion and affirmed the judgment of the Circuit Court. Petitioner filed a petition for leave to appeal to the Illinois Supreme Court, which was denied on January 29, 2001.

Currently before the Court is Imari Clemons' petition for a writ of habeas corpus, filed on June 18, 2001. For the following reasons, as detailed herein, we grant the petition.

_____

[11] The Illinois Appellate Court states that "[a]lthough the record does not clearly indicate whether Clemons was forced to entirely remove his shirt for exhibition of his tattoos, the record here goes beyond the mere removal of a jacket to display tattoos." *Davenport*, 702 N.E.2d at 344. The trial court transcript indicates that the court stated that "Defendant [Clemons] doesn't have to completely remove his clothing," and that his tattoos should be displayed "as reasonably as can be." (R. 26-4, State Ct. Tr. at G-95.)

# HABEAS CORPUS STANDARDS

Initially, a federal court cannot address the merits of a habeas corpus petition unless the Illinois courts have first had a full and fair opportunity to review the petitioner's claims. *See, e.g., Farrell v. Lane*, 939 F.2d 409, 410 (7th Cir. 1991). Illinois courts have had a full and fair opportunity to consider the claims raised in a habeas petition if: (1) the petitioner has exhausted all available state remedies (the exhaustion doctrine); and (2) the petitioner has raised all of his claims during the course of the state proceedings (the procedural default doctrine). *See, e.g., Rodriguez v. Peters*, 63 F.3d 546, 555 (7th Cir. 1995) (citations omitted). If the petitioner fails to overcome these two procedural hurdles, the habeas petition is barred. *Id.*

The standard of review for claims that survive the exhaustion and procedural default analysis is strict. Under the AEDPA, a federal court may not grant a prisoner's habeas corpus petition unless the state court's adjudication of the claim either "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2). *See also Spreitzer v. Peters*, 114 F.3d 1435, 1442 (7th Cir. 1997) (holding that a state court has reasonably applied Supreme Court caselaw if its application is "at least minimally consistent with the facts and circumstances of the case") (citation omitted); *Hall v. Washington*, 106 F.3d 742, 748-49 (7th Cir. 1997) (stating that, under this limited analysis, the state court's decision must stand "if it is one of several equally plausible

outcomes").[12]

In this case, the State argued that Petitioner did not exhaust his state court remedies to the extent that some issues that should have been raised below were not, thereby causing those issues to be procedurally defaulted. (*See* R. 15-1, Answer to Pet. at 5; R. 23-1, Answer to Pet. at 5-7.) On December 11, 2001, the Court found that Clemons' three claims in his petition had not been procedurally defaulted in that he raised all three claims in his March 20, 1999 post-conviction petition and the claims were presented to the highest state court for review on January 29, 2001.[13] (R. 19.) As such, the Court will immediately proceed to its analysis of the merits of Clemons'

---

[12] Petitioner's argument regarding a non-deferential review of the state court's decision is unavailing. *Hennon v. Cooper*, 109 F.3d 330 (7th Cir. 1997) (Posner, C.J.), the case upon which Petitioner relies in making this claim, specifically utilized the "unreasonable application" standard enumerated in the AEDPA, and stated that "[i]t doesn't follow that the criterion of a reasonable determination is whether it is well reasoned. It is not. It is whether the determination is at least minimally consistent with the facts and circumstances of the case." *Id.* at 355. Thus, even assuming *arguendo* that Petitioner's case "was rejected without explanation," (R. 25-1, Pet'r's Resp. at 6), we must utilize the "unreasonable application" standard in the instant case.

[13] Notwithstanding the Court's December 11, 2001 order, Respondent continues to maintain that Petitioner procedurally defaulted his first claim that he was denied the right to a fair trial by the admission of extraneous evidence about gangs. (*See* R. 23-1, Resp't's Answer at 5-7.) We disagree. Although Petitioner framed this argument in the language of an ineffective assistance of counsel claim, Petitioner's post-conviction petition made clear that he was concerned with his constitutional due process right to a fair trial and, specifically, the prejudicial impact of the gang evidence on the jury. (*See* R. 16-1, Resp't's Ex. B, Post-Conviction Pet. at 8-10.) *See also Whitehead v. Cowan*, 263 F.3d 708, 727 (7th Cir. 2001) (identifying the test for fair presentment, including when a plaintiff "assert[s] the claim in terms so particular as to call to mind a specific constitutional right . . . [or] allege[s] a pattern of facts that is well within the mainstream of constitutional litigation") (citations omitted); *Verdin v. O'Leary*, 972 F.2d 1467, 1474 (7th Cir. 1992) (stating that, in enforcing the rules of fair presentment, federal courts should "avoid hypertechnicality"). *E.g., Rittenhouse v. Battles*, 263 F.3d 689, 696 (7th Cir. 2001) (concluding that a petitioner had not procedurally defaulted his due process claim because a due process violation was clearly implicated by the facts and issues raised in the course of arguing an ineffective assistance of counsel claim before the state courts). Therefore, we reiterate our prior holding that Petitioner has fairly presented all of his claims to the state courts and, accordingly, that none of his claims has been procedurally defaulted.

petition.

# ANALYSIS

## I. Due Process Right to a Fair Trial

Petitioner Clemons argues that the gang-related evidence presented by Chicago Police Officer Bloore was irrelevant to the charges against Petitioner, and was prejudicial and inflammatory evidence that deprived Petitioner of his due process right to a fair trial. Bloore – the final witness called by the State in its case against Petitioner over the objections of Petitioner's counsel – described himself as a "gang specialist" and testified regarding: (1) the history of the two primary nations of gangs in Chicago, the Black Gangster Disciple Nation and the Black P-Stone Nation; (2) the organizational structure and hierarchy of a typical street gang; and (3) the tattoos worn by members of the Black P-Stones. Specifically, over the objections by Petitioner's counsel, Petitioner was forced to open his shirt for the jury while Bloore circled him in the well of the courtroom pointing out his tattoos. As evidence of Petitioner's alleged membership in the Black P-Stones, Bloore described for the jury: (1) a five-pointed star on Petitioner's arm; (2) a pyramid with an aura on his chest; (3) a stone on his arm; (4) the initials "B.S." on one hand; (5) the phrase "Stone life" on his stomach; and (6) the teardrop tattoo on Petitioner's face. On cross-examination, however, Bloore admitted: (1) he did not know when Petitioner got the tattoos; (2) he did not know whether Petitioner had any of the tattoos on October 6, 1994, the day of the shooting; and (3) he was unable to connect Petitioner with any gang nicknames including "Eric" or "Myron," the names used by witnesses to identify the suspected gunman. Thus, Petitioner argues that: (1) Bloore's testimony was introduced specifically to pander to the jury's prejudice against gangs and gang members; (2) the probative

9

value of the gang evidence was not enough to outweigh its prejudicial effect; and (3) because of the weakness of the State's case, the admission of the gang evidence calls into question the jury verdict.

The Illinois Appellate Court addressed Petitioner's arguments on direct appeal. With regard to Officer's Bloore's testimony, the court stated that, "[a]lthough a deep and widespread public prejudice may exist against street gangs, gang-related evidence will not necessarily be excluded if it is relevant and admissible." *Davenport*, 702 N.E.2d at 341 (citations omitted). The court noted that Petitioner conceded that some of Bloore's testimony was relevant to show the motive for the shooting, but that Petitioner argued that the remainder of Bloore's testimony – regarding the background, history and hierarchy of the two gangs as well as the drug operations of these gangs – was irrelevant, inflammatory and excessive. *Id.* at 342. The court held that the testimony regarding gang hierarchy was "relevant and admissible to explain an otherwise inexplicable act and to establish a motive for the shooting, *i.e.*, advancement within the ranks . . . [but] [t]he testimony regarding the background, history and criminal activity of the two gangs *is far more troublesome, as it is peripheral to the offense at issue.*" *Id.* (emphasis added). The court correctly states that "[t]rial courts should exercise great care in exercising their discretion to admit gang-related testimony." *Id.* (citing *People v. Lucas*, 603 N.E.2d 460, 472-73 (Ill. 1992). The court added that "[t]he record in this case shows that the trial court considered the arguments at length and, *while initially skeptical about the probative value of some of the testimony*, was ultimately persuaded that it was relevant and admissible."[14] *Id.* (emphasis added). The court

---

[14] Specifically, the Circuit Court of Cook County recognized that "the issue of gang membership is very inflammatory." (R. 26-2, State Ct. Tr. at E-53.) Nevertheless, the trial court held that "the probative value of such evidence outweighs the prejudicial value." (*Id.* at E-55.)

concluded that "[a]s this court must follow precedent, we follow *Lucas*, but the prosecutorial tactics employed in this case '*push the envelope*.' We urge the State to act with greater caution and restraint in the future." *Id.* at 342-43 (emphasis added).

With regard to the removal of Petitioner's shirt and his standing in the well of the courtroom in front of the jury as Officer Bloore testified about Petitioner's tattoos, the Illinois Appellate Court held that, because Petitioner did not admit gang membership and the tattoos did not address unrelated acts of gang violence and were not used for impeachment, there was no abuse of discretion in admitting the testimony against Petitioner. *Id.* (citing *Lucas*, 603 N.E.2d at 473; distinguishing *People v. Cruz*, 518 N.E.2d 320, 327 (Ill. App. Ct. 1987) (finding the trial court in error when it admitted a film depicting gang violence to impeach a witness on the issue of gang membership, because the defendant admitted his prior gang membership). The court, however, "disapprove[d] of the State's method of presenting this evidence," and stated that "[t]he State certainly had less inflammatory means of presenting the tattoos to the jury, such as by photographs." *Id.* at 344.

Finally, the Illinois Appellate Court addressed Petitioner's objections to Officer Bloore's testimony regarding "violation," the punishment a gang inflicts on its members for disobeying gang rules. *Id.* at 343. The court found that this testimony was relevant to Davenport to show

---

We have carefully reviewed the trial court transcript, including the almost forty pages devoted to the court's decisions regarding the defendants' motions to preclude the testimony of Officer Bloore, (*see id.* at E-36-74), and we come to a different conclusion; namely, that the probative value of the gang-related evidence with regard to Petitioner Clemons did not outweigh its prejudicial effect, and that, as such, but for the trial court's error in admitting the evidence, the outcome of Petitioner's trial probably would have been different, thus denying Petitioner his due process right to a fundamentally fair trial. *See Anderson v. Sternes*, 243 F.3d 1049, 1055 (7th Cir. 2001) (citation and quotation omitted).

motive and to corroborate his written statement, but it was not relevant to Petitioner's guilt. *Id.* The court concluded that "[a]lthough the State's introduction of this evidence *was improper* and its introduction of gang-related evidence peripheral to the offense charged *is obnoxious*, the evidence against Clemons was overwhelming. . . . [and] [t]he testimony about 'violations' did not contribute to his conviction and does not warrant reversal." *Id.* (emphasis added).

In a habeas challenge, any alleged error must amount to a constitutional infirmity. *See Anderson v. Sternes*, 243 F.3d 1049, 1055 (7th Cir. 2001); *Howard v. O'Sullivan*, 185 F.3d 721, 723-24 (7th Cir. 1999). As such, it is not the Court's duty to balance the probative value against the unfair prejudice because "the Due Process Clause does not permit federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules." *Anderson*, 243 F.3d at 1055 (citations and quotations omitted). Rather, we must consider whether the alleged unfair prejudice stemming from this evidence convinces us that "but for the errors, the outcome of the trial probably would have been different," thus denying Petitioner his due process right to a fundamentally fair trial. *Id.* (citation and quotation omitted). *See also Bruton v. United States*, 391 U.S. 123, 132 n.6 (1968) (stating that "[a]n important element of a fair trial is that a jury consider only relevant and competent evidence bearing on the issue of guilt or innocence"); *O'Sullivan*, 185 F.3d at 724 (maintaining that "[t]his means that the error must have produced a significant likelihood that an innocent person has been convicted," and that "because of this high standard, evidentiary questions are generally not subject to review in habeas corpus proceedings") (citation omitted).

With regard to gang evidence, the Seventh Circuit has long recognized the substantial risk of unfair prejudice attached to such evidence, noting that evidence of gang membership "is likely

12

to be damaging to a defendant in the eyes of the jury" and that gangs suffer from "poor public relations." *See United States v. Irvin*, 87 F.3d 860, 864 (7th Cir. 1996) (citing *United States v. Lewis*, 910 F.2d 1367, 1372 (7th Cir. 1990)); *United States v. Butler*, 71 F.3d 243, 250-51 (7th Cir. 1995) (citing *United States v. Rodriguez*, 925 F.2d 1049, 1053 (7th Cir. 1991)). The Court of Appeals added that "[g]angs generally arouse negative connotations and often invoke images of criminal activity and deviant behavior. There is therefore always the possibility that a jury will attach a propensity for committing crimes to defendants who are affiliated with gangs or that a jury's negative feelings toward gangs will influence its verdict." *See Irvin*, 87 F.3d at 865-66 (citing *United States v. Thomas*, 86 F.3d 647, 652-54 (7th Cir. 1996) (stating that "the danger of unfair prejudice from gang evidence stems from the potential inference that a defendant is guilty by association"). *See also Dawson v. Delaware*, 503 U.S. 159, 163-65 (1992) (recognizing the prejudice that a defendant might suffer from being linked to a gang, and holding that the use of gang membership without more as an enhancement factor at sentencing violates the First Amendment); *Cruz*, 518 N.E.2d at 327 (stating that "in Chicago, as in every other large metropolitan area, there is a deep, bitter, and widespread prejudice against street gangs"). Consequently, while acknowledging that – *under appropriate circumstances* – gang membership and gang activity evidence has probative value that can outweigh claims of unfair prejudice, the Seventh Circuit demands careful consideration by district courts in determining the admissibility of such evidence. *See Butler*, 71 F.3d at 251.

In this case, after carefully reading the state trial court transcript and the entire state court record, we find that Petitioner's due process right to a fundamentally fair trial was denied by the state court's objectively unreasonable admission of highly prejudicial gang-related evidence.

First, there is no doubt that Officer Bloore's testimony was highly prejudicial, and we believe that it was introduced specifically to pander to the jury's prejudice against gangs and gang members. Indeed, that this was the purpose and effect of Bloore's testimony is underscored by the State's decision to use Bloore at the end of its case. Although Bloore had no knowledge that tied Petitioner to the shooting, he made two points that the State could not directly make: (1) that gangs are violent criminal organizations that the jurors should fear; and (2) that Petitioner is a member of one of the street gangs that citizens of Chicago rightfully should fear. As a result of Bloore's testimony, it was impossible for the jurors to deliberate without having their minds clouded by fear. The testimony prejudiced the jury by making them think of Petitioner not as Imari Clemons, but as an undesirable – the kind of person who should be locked away because of who he is, rather than what he has done. The inference that Petitioner is guilty by association with the Black P-Stones (*i.e.*, a P-Stone shot Columbus, Petitioner is a P-Stone, therefore Petitioner should be held responsible for the crime) is precisely the sort of unfair prejudice from gang evidence that the Seventh Circuit advised this Court to avoid. *See Thomas*, 86 F.3d at 653.

After finding that the gang-related evidence was highly prejudicial, we further hold that the probative value of the evidence was not enough to outweigh its prejudicial effect. We do not believe that Officer Bloore's testimony made it more probable that Petitioner, rather than any other Black P-Stone, was the shooter. Indeed, even if some portions of Bloore's testimony relating to gang hierarchy were marginally relevant to show a potential motive for the crime, the bulk of his testimony – involving gang history, organization and activities – was completely

irrelevant.[15] Moreover, forcing Petitioner to disrobe and display his tattoos to the jury was also unnecessary and irrelevant: (1) it was unnecessary because Bloore had seen Petitioner in the lockup prior to his testimony and, as such, he could have testified concerning Petitioner's tattoos without subjecting Petitioner to the prejudicial display before the jury; and (2) it was irrelevant because neither Bloore nor any other witness testified that Petitioner either had the tattoos or was a Black P-Stone at the time of the shooting in October 1994, nearly three years before his trial. Therefore, because the gang-related evidence in this case was highly prejudicial to Petitioner and was without significant probative value, the state trial court should have excluded the evidence. *See Bruton*, 391 U.S. at 132 n.6 (holding that a jury should consider "only relevant and competent evidence bearing on the issue of guilt or innocence"); *Chambers v. State of Florida*, 309 U.S. 227, 236-67 (1940).

Finally, we conclude that, because of the weakness of the State's case against Petitioner, the admission of the gang-related evidence calls into question the jury verdict. The Seventh Circuit has stated that, "[w]hen considering whether a due process violation entitles a defendant to habeas relief the court will consider the remaining evidence to determine whether the improperly admitted evidence calls into question the jury verdict." *Anderson*, 243 F.3d at 1056 (citation omitted). In this case, the Court's consideration of only the properly admitted evidence reveals that the State's case against Petitioner is extremely weak. The State based its case upon

_____

[15] Specifically, the Illinois Appellate Court concluded that: (1) this testimony "is far more troublesome [than the rest of Bloore's testimony], as it is peripheral to the offense at issue"; (2) the State's tactics in this case "push[ed] the envelope"; and (3) the use of this testimony was "improper" and "obnoxious." *See Davenport*, 703 N.E.2d at 342-43. Although we conclude that the Illinois Appellate Court acted unreasonably in determining that Bloore's testimony did not deprive Petitioner of a fair trial, we observe that its characterization of the gang-related evidence was accurate.

the testimony of three purported eye witnesses, all of whom were members of the Gangster

Disciples. The Gangster Disciples are the rivals of the Black P-Stones, the gang to which the

gunman and – according to Officer Bloore – Petitioner belonged. In light of these three

eyewitnesses' possible motive to blame a P-Stone for the shooting, their testimony of these

witnesses was highly suspect.[16]

The State's case against Petitioner was further weakened by the fact that the description

of the shooter varied widely in the days following the shooting, from a description that did not fit

Petitioner into a description somewhat resembling him. (*See* R. 26-2, State Ct. Tr. at E-178-79;

R. 26-3, State Ct. Tr. at F-148-51.) Finally, the State's case was undermined by the fact that the

subsequent identifications of Petitioner as the shooter were seriously flawed: (1) the lineups in

which Petitioner was identified by Antwan and Weathers were held over one year after the

shooting, both witnesses knew that the person the police suspected had a teardrop tattoo and

Petitioner was the only individual in the lineup with such a tattoo; (2) Wesley's identification of

Petitioner while in the Cook County Jail bullpen occurred after his previous encounter with

Petitioner in which he learned that Petitioner was being held in connection with the shooting, and

---

[16] Furthermore, Antwan Hart's testimony that he was looking at the gunman's face throughout the incident is undermined by the testimony of Ronald Robinson, another witness to the shooting who testified that Antwan had bent over to tie his shoes immediately prior to the shooting. Additionally, although credibility determinations are generally the province of the jury, we believe that – given the already highly suspect nature of their testimony – Weathers and Wesley's credibility is further undermined by their extensive criminal records, including pending charges that were to be prosecuted by the same State's Attorney's office for which they were now testifying. *See* Fed. R. Evid. 609(a). Indeed, although both individuals denied that they had been offered deals in exchange for their testimony, Wesley admitted that he "wouldn't mind" if the State's Attorney did something on his behalf as a result of his testimony. (*See* R. 26-3, State Ct. Tr. at F-83-84.)

Wesley initially did not mention the gunman's teardrop tattoo to investigators.[17] Consequently, in each of these identifications, it is no more likely that the witness identified Petitioner because he was the individual that the witness saw on the day of the shooting than it is that Petitioner was identified because the witness knew he was the individual that the police suspected. *See Cossel*, 229 F.3d at 655-56 (discussing the reliability of witness identifications).

Between the witnesses' lack of credibility, their shifting descriptions of the shooter and their questionable identification of Petitioner, the State had a very flimsy case, especially when combined with the fact that the State had no murder weapon, no clothing and no other physical evidence to tie Petitioner to the shooting. Hence, we believe that "but for" the admission of the gang-related evidence, "the outcome of [Petitioner's] trial probably would have been different." *See Anderson*, 243 F.3d at 1055 (citation and quotation omitted). Petitioner's right to a fair trial was thus clearly violated because he was convicted on the basis of inflammatory, prejudicial and irrelevant evidence, and the state courts' refusal to exclude this evidence was an objectively unreasonable application of the Constitution's guarantee of Petitioner's right to a fundamentally fair trial. Therefore, because the improperly admitted gang-related evidence "calls into question the jury verdict," *see id.* at 1056, we hereby grant Petitioner's request for habeas relief and set aside his conviction.

## II. Ineffective Assistance of Counsel

Petitioner argues that he was denied his right to the effective assistance of counsel at both the trial and sentencing stages when: (1) trial counsel failed to investigate alibi witnesses or

---

[17] Several witnesses testified that teardrop tattoos are quite common; indeed, they are "widespread among gang members." (*See* R. 26-2, State Ct. Tr. at E-53, E-148-49; R. 26-3, State Ct. Tr. at F-124; R. 26-4, State Ct. Tr. at G-96.)

otherwise present an alibi defense at trial; and (2) trial counsel failed to investigate and present mitigation witnesses at sentencing.

The seminal case for assessing claims of ineffective assistance of counsel is *Strickland v. Washington*, 466 U.S. 668 (1984). To state a valid claim under *Strickland*, Petitioner must establish that: (1) his counsel's performance was objectively unreasonable; and (2) but for his counsel's deficient representation, the outcome would have been different. *Id.* at 687-88. "Both components are necessary; the lack of either is fatal." *Eddmonds v. Peters*, 93 F.3d 1307, 1313 (7th Cir. 1996). Moreover, there is a strong presumption that a criminal defendant's counsel rendered assistance falling within an objective standard of reasonableness. *Mason v. Godinez*, 47 F.3d 852, 855 (7th Cir. 1995) (citing *Strickland*, 466 U.S. at 689).

## A. Ineffective Assistance at Trial

Petitioner contends that trial counsel's failure to investigate alibi witnesses or otherwise present an alibi defense rendered counsel's assistance ineffective. In particular, Petitioner claims that: (1) the Court is not required to defer to the Illinois Appellate Court's finding of fact that trial counsel communicated with the alibi witness and Petitioner is entitled to an evidentiary hearing on this claim; and (2) trial counsel's performance was deficient and prejudicial due to his failure to investigate and to present an alibi defense. In connection with this claim, Petitioner submitted an affidavit from his brother, Lenard Clemons, which stated that on the day of the shooting, Petitioner was with him and Monary Britton in Milwaukee, Wisconsin, rather than in Chicago, Illinois, and that he was never contacted by Petitioner's counsel to testify.[18] Thus,

---

[18] The affidavit of Monary Britton was not attached to Petitioner's habeas petition or to any of Petitioner's motions before the state courts. Therefore, we may only consider Lenard Clemons as a potential alibi witness on behalf of Petitioner.

Petitioner argues that, because of the State's weak case against him, there is a strong probability that Petitioner would have been acquitted had trial counsel investigated and presented alibi witnesses to support Petitioner's claim that he was in Milwaukee at the time of the shooting.

With regard to Petitioner's claim of ineffective assistance of counsel at trial, the Illinois Appellate Court found that "the transcript of proceedings shows that counsel clearly communicated to the trial court that he did not think that the prospective witnesses could recall the proper times and events sufficiently to be good witnesses."[19] *Davenport*, 702 N.E.2d at 344. As such, the court concluded that "the charge of ineffective assistance of counsel lacks substance and pertains only to trial tactics . . . [and] the trial court did not err in failing to examine the effectiveness of trial counsel." *Id.*

When reviewing a petition for a writ of habeas corpus, factual determinations made by the state trial and appellate courts are presumptively correct, and Petitioner has the burden of overcoming this presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Lieberman v. Washington*, 128 F.3d 1085, 1091-92 (7th Cir. 1997). Moreover, we note that the alibi testimony of an interested family member – here, the Petitioner's brother, Lenard Clemons – is less valuable than the testimony of a disinterested witness. *See United States ex rel. Emerson v. Gramley*, 883 F. Supp. 225, 236-37 (N.D. Ill. 1995) (Aspen, C.J.).

In this case, we are constrained by both the finding of fact by the Illinois Appellate Court – supported by the record – and by the strong presumption in favor of finding effective assistance

---

[19] The Illinois Appellate Court based this finding on the following statement by Petitioner's counsel to the trial court during sentencing: "I just didn't think that [the two witnesses] could recall the proper times and events to be a good witness for Mr. Clemons on his alibi defense." (R. 26-6, State Ct. Tr. at H-8-9.)

of counsel enumerated in *Strickland*. The affidavit of a clearly biased witness is insufficient to overcome the state court's finding that trial counsel's tactics in not calling unreliable witnesses was not ineffective. Moreover, Petitioner simply cannot show that the outcome of the trial would have been different had his brother testified that Petitioner was in Milwaukee at the time of the shooting.[20] Finally, the Court is not in a position to grant Petitioner's request for an evidentiary hearing on this claim because he does not satisfy the requirements of 28 U.S.C. § 2254(e)(2).[21] *See, e.g., United States ex rel. Smith v. Washington*, 992 F. Supp. 964, 968-69 (N.D. Ill. 1998).

## B. Ineffective Assistance at Sentencing

Petitioner maintains that, in light of the seriousness of the crime for which he was convicted, trial counsel's failure to put forth any significant effort to mitigate Petitioner's

---

[20] We note, however, that – given our conclusion that Petitioner was denied his due process right to a fair trial by the admission of the gang-related evidence at the end of the State's flimsy case – the introduction of Lenard Clemons' affidavit and testimony in any subsequent proceedings may benefit Petitioner's cause.

[21] 28 U.S.C. § 2254(e)(2) provides that:
If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that–
(A) the claim relies on–
(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.
*Id.* Thus, even assuming *arguendo* that Petitioner could satisfy the first requirement based on his allegations that he was never given an opportunity to develop the facts of this claim before the state courts, he still cannot satisfy the second requirement because his brother's affidavit is not "sufficient to establish by clear and convincing evidence . . . [that] no reasonable factfinder would have found [Petitioner] guilty of the underlying offense." *Id. See also Porter v. Gramley*, 112 F.3d 1308, 1317 n.8 (7th Cir. 1997).

sentence constituted ineffective assistance of counsel. In particular, Petitioner argues that trial counsel's failure to investigate and present possible mitigation witnesses – including Petitioner's mother, Kausandra Clemons, and Petitioner's brother, Lenard Clemons – constituted deficient performance that prejudiced Petitioner's attempt to mitigate his sentence.

At Petitioner's sentencing hearing, trial counsel did not present any mitigation witnesses. Rather, counsel cited the presentence investigation report, and he stated that:

> [A]lthough Cassandra [sic] Clemons was Mr. Imari Clemons' mother[,] she didn't give him much insight and help in growing up as a child. I usually don't like to knock mothers, but in this particular case where I see that some of his brothers have also been charged in the past and found not guilty of murder. It leads me to believe his mother really didn't keep any reins on her children.

(R. 26-6, State Ct. Tr. at H-7-8.) After hearing arguments in aggravation and mitigation, the Circuit Court of Cook County sentenced Petitioner to fifty-nine years in prison.[22] In sentencing Petitioner, the trial judge maintained that "[t]here is *nothing to mitigate* the Defendant's conduct. Nothing whatsoever."[23] (*Id.* at H-11 (emphasis added).) The judge described Petitioner as "a young man without remorse, without any contrition whatsoever, and you're quick to blame others including me, the trial judge, for your problems and your life." (*Id.* at H-10.) He went on to call Petitioner "a senseless, remorseless unfeeling predator" for whom there was "no hope." (*Id.* at H-11.) The judge concluded that "[t]he record will show Imari Clemons is smiling as he is being led from this place. *You can join your gang banger friends down in the penitentiary, Mr.*

---

[22] The sentencing range was between twenty and sixty years. The State sought the maximum term possible.

[23] In affirming the judgment of the Circuit Court of Cook County, the Illinois Appellate Court held that this comment was "insufficient to show that the trial court failed to consider mitigating factors, where the whole of the record shows that such evidence was presented to and considered by the court." *Davenport*, 702 N.E.2d at 345 (citations omitted).

*Clemons.* I am sure you will be happy." (*Id.* at H-12 (emphasis added).)

In making our determination regarding ineffective assistance of counsel at sentencing, we are guided by the Supreme Court's pronouncement in *Penry v. Lynaugh*, 492 U.S. 302 (1989):

> If the sentencer is to make an individualized assessment of the appropriateness of the death penalty, evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional or mental problems, may be less culpable than defendants who have no such excuse.

*Id.* at 319 (citation and quotation omitted). *See also Williams v. Taylor*, 529 U.S. 362, 395-99 (2000) (failure to investigate a defendant's upbringing was grounds for claim of ineffective assistance at sentencing). Furthermore, this district recently granted a petitioner's writ of habeas corpus in a death penalty case on the grounds that he received ineffective assistance of counsel at sentencing due to counsel's failure to investigate the petitioner's background. *See United States ex rel. Madej v. Gilmore*, 2002 WL 370222 (N.D. Ill. 2002) (Coar, J.). The court held that if counsel in *Madej* had investigated his client's background, he would have found a mother willing to testify on behalf of her son, as well as evidence of the petitioner's troubled childhood. *Id.* at 6. Therefore, the court concluded that the petitioner had "an unbalanced sentencing hearing where aggravating evidence was introduced but mitigating evidence was not, due to his attorney's failure to investigate." *Id. See also Patrasso v. Nelson*, 121 F.3d 297, 303-04 (7th Cir. 1997) (applying the little-used *United States v. Cronic*, 466 U.S. 648 (1984), standard – where counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, counsel could be adjudged ineffective without a showing of prejudice – and finding ineffective assistance at sentencing where counsel "made no effort to contradict the prosecution's case or to seek out mitigating factors").

In this case, Petitioner's counsel failed to exert any efforts on Petitioner's behalf at sentencing, despite the fact that the record clearly contained mitigation evidence. Kausandra and Lenard Clemons' affidavits assert that trial counsel never spoke to them about possible testimony. (*See* R. 16, Resp't's Ex. B, Post-Conviction Pet.; R. 1, Habeas Pet., Ex. A.) Had trial counsel interviewed these witnesses, he would have learned that Kausandra would have testified to Petitioner's poor upbringing, that she had raised an "impecunious family" and that Petitioner "turned away from his family and to the streets." (R. 16, Resp't's Ex. B.) She would also have testified to Petitioner's good character. (*See id.*) Lenard's testimony would have corroborated and complemented Kausandra's testimony, as he would have commented on "the lack of a father role model in [P]etitioner's life" and the fact that he "is a follower and not a leader and is easily influenced." (R. 1, Habeas Pet., Ex. A.)

While we recognize that evidence of Petitioner's upbringing is not inherently mitigating, *see Skipper v. South Carolina*, 476 U.S. 1, 5-8 (1986), and that the testimony of an interested family member is less valuable than the testimony of a disinterested witness, *see Gramley*, 883 F. Supp. at 236-37, we believe that Petitioner's family members could have presented testimony going to the heart of the issues articulated by the Supreme Court in *Penry* in a manner that trial counsel's cold reading of a presentence report could not. In this case especially, where it is apparent that the trial judge would have an unfavorable view of Petitioner because of his crime and criminal history, trial counsel had a duty to seek out any potentially mitigating evidence. *See Patrasso*, 121 F.3d at 304 (citation and quotation omitted). Rather than put forth an effective mitigation argument at sentencing that included the testimony of Kausandra and Lenard Clemons, however, trial counsel did little more than appear as "a warm body" next to Petitioner.

23

*See id.* It was therefore objectively unreasonable for the state court to conclude that counsel's performance was not deficient.

This Court further concludes that, not only was trial counsel's performance deficient, but his failure to present mitigation evidence at Petitioner's sentencing also satisfies the prejudice prong of the *Strickland* test. Under this prong, Petitioner need only show that there is a "reasonable probability" that the result of his sentencing would have been different had counsel not been deficient. *Strickland*, 466 U.S. at 694. We believe that, had Petitioner's mother and brother testified, Petitioner would have been put in a much more favorable light. Indeed, we think that counsel's arguments accusing Kausandra of being a poor mother, rather than mitigating Petitioner's sentence, actually had the reverse effect of further prejudicing the trial judge against Petitioner, as evidenced by the judge's comment that Petitioner was "quick to blame others . . . for your problems and your life." (R. 26-6, State Ct. Tr. at H-10.) Because counsel's performance at sentencing made Petitioner appear almost completely unsympathetic before the trial judge, there is certainly a reasonable probability that the result would have been different had counsel performed effectively, in that the judge likely would not have felt compelled to impose the harshest sentence possible. The state courts' refusal to accept Petitioner's claim of ineffective assistance of counsel at sentencing was, therefore, an objectively unreasonable application of *Strickland*. As such, in conjunction with our holding above that Petitioner Clemons is entitled to a writ of habeas corpus because his conviction was obtained in contravention of his due process right to a fair trial, we also find that Petitioner is entitled to a resentencing – as appropriate – in a proceeding in which he is represented by adequate counsel

24

and allowed to fully present his mitigation evidence.[24]

## CONCLUSION

This Court understands and recognizes the limited role that federal habeas review has in the state criminal justice system. Our role is not to second-guess decisions made by our state judicial colleagues or to determine if Petitioner Imari Clemons is in fact guilty as charged. Instead, this Court focuses on whether Petitioner's constitutional rights were unreasonably violated during the state court proceedings. We conclude, as detailed herein, that Petitioner has met this exacting standard and that the state courts' adjudication of his claims resulted in a decision that was contrary to, and involved an unreasonable application of, clearly established federal constitutional law.

Accordingly, for the reasons set forth above, Petitioner's writ of habeas corpus is granted. (R. 1.) The State of Illinois is ordered to release Petitioner from prison unless the State retries and resentences him, as appropriate. Therefore, pursuant to Federal Rule of Civil Procedure 58, the Clerk of the Court is instructed to enter judgment in favor of Petitioner Imari Clemons and against Respondent Jonathan Walls.

ENTERED:

**Judge Ruben Castillo**
**United States District Court**

**Dated: May 1, 2002**

---

[24] We note that Respondent's second answer, (R. 23-1), was remarkably unhelpful in aiding the Court in our determination of the merits of Petitioner's ineffective assistance of counsel claims, having mirrored word-for-word Respondent's first answer, (R. 15-1). Thus, we urge the Attorney General's office to devote more resources to its pleadings in the context of habeas corpus proceedings. *See, e.g., United States ex rel. Gilyana v. Sternes*, 180 F. Supp. 2d 978, 984 n.6 (N.D. Ill. 2001).